Samuel Maldonado v. Warden Adirondack Correctional Facility Counsel Good morning, Your Honors. May it please the Court, my name is Sarah Kunstler and I represent the defendant appellant in this matter, Samuel Maldonado. Did you just say the previous argument? I did. So that guy got 21 years. Your guy got a great deal compared to that. Well, I mean, he got 15 years, the statutory maximum in post-release supervision, a term that was not explained to him by either his counsel or the state court. But he only had 5 years of incarceration. Is that correct? That's correct. But that 15-year term comes with a whole host of restrictions. It comes with 13 general conditions, none of which were explained to him. And in the case of a sex offender, additional restrictions. But he was told about this. He was told about this the day before and then he was told about it the day of. And I guess we're getting ahead of you a little bit. And I apologize for that. So you can say whatever you want to say, but that's my, that's going to be my question ultimately. Yes. Well, I mean, I can speak directly to that, Your Honor. I mean, what his counsel said was that he spent an hour with him in the pens. And that during that time, the issue did not come up in the pens, that he was not properly advised, nor was he given sufficient opportunity to negotiate the length of post-release supervision to be imposed. Counsel furthermore conceded that he may have mistakenly calculated the 10 years he was certain would be part of an order of protection with the 5 years that would be given as supervised release. And that he believed that the people would have agreed to 5 years post-supervised release had it been properly discussed before the plea. So it was an hour in the pens during which he was not properly advised. And Your Honor, before this argument, I timed myself into how long it would say the words 15 years post-release supervision. It was said twice during his plea. It takes under 3 seconds to say those words. Right. So, you know, saying if the people said it once and the court said it twice, that's 6 seconds to let it sink in during a plea that that was what he was facing. He was entitled to more than 6 seconds to understand that term. Now, I know that Judge Corman, the district court, said that those words are essentially self-defining. I would say that's not true. You know, that may be true for the judge and that may be true for experienced counsel. But it's not true for Mr. Maldonado, who had never served a term of supervision before. And it's not true in the environment of a courtroom, which is intimidating. It's an intimidating place. Words are, you know, the words come quickly. It's, you know, you're standing there, you're nervous, you're making a big decision in your life. And to hear those words for 6 seconds for the first time to understand the term of what you're facing is really not enough to understand that. Not only that, he seemed concerned about it. He voiced some concern and the judge just moved on. It happened exceedingly fast. And your honors know that state court proceedings happen quicker than federal proceedings. And that's, and particularly because they happen so fast, the court has a greater obligation. You know, Mr. Maldonado was given an offer the day before. He was pressured into accepting it that day. He said no. The next day, he was re-offered and his only opportunity to discuss it was an hour before the plea in the pens. It's just... I'm sorry. Why don't you finish your thought and then I have a question for you. No, go ahead, your honor. Could you address the overlay of deference that we need to apply to the state court decision? Because Mr. Maldonado's claim is governed by AEDPA. So not only do we need to determine that there was some sort of error here, we need to decide that the state court's application of law was unreasonable. And we also have to decide it was unreasonable not just according to our own rights, right? But according to the Supreme Court precedent, right? So could you address that, please? Yes, your honor. Well, first, the district court did find that there was ineffective assistance of counsel here. And that my client had the absolute obligation to understand that term. You know, the court's decision, the appellate division's decision was unreasonable because they gave no indication of what they considered. They gave no indication, for example, that they considered the lawyer from my client's counsel, you know, conceding immediately after. But given the AEDPA standard of deference as I understand it, they don't even need to provide an explanation. We need to provide any imaginable justification. That's our job. Yeah. So... But their failure... I'm not telling you that I agree with that, but that is the law. But their failure to provide an explanation is what enables the district court to kind of sift meaningfully through the facts to see if there is a meaningful explanation. And based on these facts, on this record, the advice that this lawyer patently failed to give his client, he found that there was no reasonable explanation for that decision. Here's a... I think that Judge Corman latched on, and I believe the government latches on to this. And it's that Mr. Maldonado seems singularly interested and focused on being with his family, his wife and children, as I understand. Which is unrelated at a basic level to post-conviction supervised release. I mean, you know, unless things go sour, obviously. So why isn't that a reason to think that even if counsel's failure to advise him and explain to him what post-conviction supervised release would be, why isn't that some evidence of lack of prejudice? He would have planned it anyway, understanding that he complained about it the next day. Well, if he fully understands the terms of PRS, Your Honor, PRS, first of all, has a high failure rate. It has very steep expectations that often land offenders back in prison and away from their families. But, Your Honor, I respectively disagree that he would have planned it anyway. I think there is a wealth of objective contemporaneous evidence that he... No, no, no. That's... Again, that's... And I appreciate what you're saying. I don't know that that's the question. So if we can have a reasonable disagreement about whether he would have pled... And I tell you, Ms. Consular, I do not agree with this, but that is what I'm bound to apply. This is the law that I'm bound to apply. If we can have a respectful disagreement where it's a reasonable disagreement about what the facts show, then it seems to me that your client loses under AEDPA. Well, I would argue that if we look at these facts, it's clear what my client would have done had he had known. And that it goes in the opposite direction, that it's not a reasonable disagreement, but that what the contemporaneous evidence shows is that he immediately repudiated it. He called his lawyer the same day, the right after his plea, called his lawyer and said, I have a problem with this. After those six seconds sunk in with him, he said, I have a problem with this. I do not want to do this. He wrote, you know, he filed his pro se motion two days later. It was supported by a letter from his lawyer who said, oh my God, no, we did not discuss this. We spent no time on this. I had no idea this was happening going in. So I do think his immediate repudiation, you know, settles the question. I'm sorry to interrupt. Go ahead, your Honor. Then there is, of course, the extra overlay that the Supreme Court has never really pronounced that a court's failure to advise a defendant of a term of post-release supervision violates due process. What are we to do with that? I mean, there are many hurdles, unfortunately for your client, that need to be left over. And that's maybe the last one. I understand that, your Honor. In addition, our circuit has never decided that post-release supervision is a direct consequence of the guilty plea. For sex offenders, we reserved the answer to that question in two previous cases. Yes, but you haven't decided that's the contrary. And in early v. Murray, this court held that post-release supervision could not be administratively added to a defendant's sentence, holding that post-release supervision, which comes with the possibility of revocation and additional jail time, is custody. Now, that decision would seem to suggest that you would hold it, even though you have reserved decision on it in the past. You know, more so, as the district court noted, there's a general standard here, right? And where a general standard is clearly established, state court decisions must fit within the matrix of the court's prior decisions, or within the scope of the general principle, even if the precise contours are unclear. Right here, under Supreme Court precedent, Brady and Boosley, a defendant is entitled to be made aware of a plea's direct consequences. But isn't the problem, and I appreciate that you're coming back to Supreme Court precedent, because I think you're right that the case law clearly requires that the reasonableness of the state court determination be measured exclusively by reference to the Supreme Court precedent. So when we know that the Supreme Court has never said that advising of supervised release, or these other post-incarcerated terms need to be something that the defendant is made aware of, then how can we say that based on our own precedent or our own intuition in the first place, that this is in fact something that the defendant had to be advised of? If the Supreme Court hasn't said that, then how can we say that the appellate division was wrong for not thinking it, if the Supreme Court has not said it? Because, as your court has held, it is custody. And custody is a direct... Well, it doesn't matter whether we say it, right? That's the problem, right? The Supreme Court has to have said it. I mean, we've had cases where we say, well, we've held X, same in 2255, right? Because we have direct authority to rule on it. And we may say, then, in a subsequent appeal of a 2254, that even though a state court did something contrary to our holding, that wasn't necessarily an unreasonable application of the Supreme Court's law. And that's where I'm struggling. Even if we've said something explicitly, we can uphold a contrary ruling of a state court under 2254. Because general standards matter here. What post-relief supervision is, matters here. That's why the Supreme Court has repeatedly stated that ENPA does not require state and federal courts to wait for some nearly identical fact pattern before a rule can be applied. If appellants like my client had to wait for that, then there would be a pinhole that these cases had to go through in order to find justice. And here, because of what post-relief supervision entails, because it is custody, because general standards recognize it as custody, then, you know, that's why there's a basis here for Your Honors to rule in my client's favor. All right, counsel, you have exceeded your time. You've reserved two minutes for rebuttal. We'll turn to the government. Thank you, Your Honors. Thank you. Good morning, Your Honor. Michael Pierce of the King's County District Attorney's Office on behalf of the respondent. The petitioner was correctly denied habeas corpus relief in this case. As the panel has stated, epidepherence applies to the Second Department's merits rulings in this case, which means the question is not merely one of error, but whether the Second Department's decision was so devoid of reason that no jurist of reason could agree with it or even debate whether it was correct. And petitioner hasn't satisfied that standard. With respect to the deficient performance element of Strickland, the record undercuts or undermines most of petitioner's most serious claims of deficient performance. So there's a claim in the brief that plea counsel utterly failed to discuss the possibility of any post-release supervision, much less a term of 15 years with the petitioner. But even plea counsel's most damning statement in state court, the December 8th letter, said that plea counsel had discussed. Where is that in the record? That's appendix page 64 and 65. I think it's a two-page letter. It says there was little discussion as to post-release supervision in advance of the guilty plea. I told the defendant that he would likely get five years. So an erroneous estimation of the term, certainly. But it states, and this is one of the worst statements for plea counsel, it states that there was a discussion of it. And then a few days later, an open court plea counsel walked back the statement that he hadn't informed the petitioner of the possibility of 15 years post-release supervision, saying that he had informed him of the possibility, but didn't say definitively that he would get that, that that's what the plea agreement would be. Where is that in the record?  I believe that that is at page, appendix page, I apologize, A-74. So the record undercuts many of the petitioner's most serious claims expressly. Moreover, his conduct at the plea colloquy undercuts many of his other claims. For example, that he didn't receive any information about what post-release supervision would entail. It was explained twice, or it was mentioned twice on the record. He didn't ask to stop the proceeding or ask any questions about it like he did with civil confinement, which he was very concerned about and said was his only issue that day. This comes into play more with the prejudice inquiry, but it also is evidence that he had received some advice about what this term meant and what it was. Certainly, there was no showing of deficient performance so compelling that the Second Department was compelled to accept it. There's also under federal law, Supreme Court holdings, a line of cases saying that counsel didn't have to give any particular advice about post-release supervision because it is a collateral consequence. But you agree with counsel? You agree with opposing counsel who said that it's custody and we've viewed it as custody? We have viewed supervised release as custody? For habeas purposes, I agree that that's... For any purposes, it's custody, isn't it? I agree that that's true, but it doesn't answer the question definitively. The inquiry in this context is only whether the Supreme Court's holdings, not even its dicta and not court of appeals decisions, have held that this is a direct or a collateral consequence. And there's simply no law saying that it is a direct consequence, and the Supreme Court has reserved decision on very similar questions. This court, in unpublished decisions in Bonner and Pignataro, said that the Supreme Court hasn't definitively answered this question, even if the Second Circuit, as a matter of first impression, would come to a different conclusion. So deficient performance wasn't established to the point where the Second Department was compelled to accept it. But even assuming for the sake of argument that some component of deficient performance was present, there was also no compelling showing of prejudice. So one of the things that the record potentially leaves open, I won't say conclusively establishes because I don't know that it does, but it leaves open the possibility that the defendant was not informed by counsel that he would actually receive 15 years of post-release supervision, but that term was twice recited on the record during the plea colloquy. And again, he didn't express any hesitations, seek clarification, or to stop the proceedings. Indeed, at a later proceeding before the same judge, the judge said that he had not been taken by surprise by what the court said. And defendant was then 37 years old. I take the point that he may not have been on post-release supervision before, but he also wasn't a complete neophyte to the criminal justice system or a minor or close to being a minor being railroaded in this process. Moreover, again, he was able to talk about civil confinement, which he said was his only concern. Moreover, his contemporaneous statements show that he was overwhelmingly focused on limiting his time in custody, not as that term is used in the habeas context, but either in prison or in civil commitment, because he provided for his family and would be unable to work and do that if he were in that kind of custody. And the plea agreement that he obtained was unquestionably highly favorable on that score. He got five years in prison as opposed to the 10 that the prosecution had been offering and the much higher maximum, I believe it was 25 years, that would have prevailed after a trial. And that also undercuts any potential claim of deficiency for failure to negotiate, right? Because petitioner would have to show that a better offer was available, that would have been amenable to the court and the prosecution, and that he would have accepted it. But his contemporaneous statements show that this was a great deal for him on what he was concerned about, the term of incarceration or civil commitment, similar. I acknowledge that the timing of his attempt to withdraw is a point in his favor or at least not affirmatively against him. There's no evidence of gamesmanship, I would agree in this case. But that doesn't change the fact that the second department wasn't compelled to have that fact predominate over all the others, particularly in a context where in open court under oath, he had sworn that he understood what was going on after the term had been mentioned on the record and agreed to go forward. So unless there are further questions on the prejudice issue, I'll probably move on to the due process claim. It's essentially the same standards that I cited with respect to direct and collateral consequences in the attorney-in-effectiveness context apply clearly and directly in this context. There is an inferential step in the attorney-in-effectiveness context that isn't present here. And again, there's no Supreme Court case law saying that post-release supervision is a direct consequence about which the plea court had to say anything at all. But even if the plea court had to say something, it did say something. It said that he would receive a 15-year term and use the phrase post-release supervision. There's certainly no Supreme Court case law out there suggesting that more was required. And as I mentioned in my brief, there are a lot of Rule 11 colloquies in federal court that don't go far beyond that, certainly don't go to the degree that he's asserting in his brief that he had to be aware of restrictions on his ability to travel or visit bars. Those are often absent from colloquies, even in federal court under the higher Rule 11 standards, which state courts are not bound. So the petitioner also made no showing of the due process violation that the Second Department was compelled to accept under the high AEDPA standards. Unless there are further questions, I'll rest on my brief. Thank you, counsel. We'll hear two minutes from Ms. Kunstler. Thank you, Your Honors. First, you know, the district court erred in relying on the fact that my client appeared alert and asked questions. As alert as my client may have appeared, the burden was not on him to make sure he understood the terms of his plea. The fact that he may have asked questions about some pieces and not others doesn't make him the lawyer. It doesn't make him understand. What is your response to, and I know that it was not perfect advice, but to pages 63 to 64 and then 74 of the appendix where Mr. Udell says or indicates that he told him about post-release supervision. He got the numbers wrong, but... Yeah, I mean, he says that he told him about it. The context is an hour before his plea in a rushed process where he acknowledges that they didn't really get into it and that he didn't understand the term and he wasn't focused on it. So, you know, and also he's changing his story from one letter to the next, from one court appearance to the next, and he's expressing confusion in open court about these terms and about other terms. So, it doesn't appear to me by this record that he had a solid grasp of what my client was facing in order to properly advise him and had a short window, one hour, in which to do so. That's my response to that, Your Honor. Counsel, if I agreed with you that this supervision of sentence was a direct consequence of his plea, how far does that get you? Well, I wanted to respond to something that my opponent said. You know, it's not just you agreeing, it's the New York State Court of Appeals that agrees that it's a direct consequence. They've held in people v. Boyd that informing defendant of PRS is a direct consequence, right? So, having held that, and if you agree with me, Your Honor, then my client's due process rights were violated here. Could you explain that? I thought the only court that matters is the U.S. Supreme Court. Isn't that what 2254 tells us in the case law? Yes, but these are the general standards, and general standards matter. General standards are what you yourselves have held and what the New York State Court have held. I'm just responding to what my opponent, citing his cases, about what a direct consequence is in New York State. If we conclude it's a direct consequence, tell me the next step. What do we do? We need to, as counsel pointed out, it's a case of first impression on our circuit. The circuit decides that it is. You still are short, as Judge Nardini points out, of Supreme Court precedent. How far does Second Circuit precedent get you? Well, I think the Second Circuit precedent gets me to a due process violation, which overturns my client's conviction and allows him to go back to where he started. I wish you were right, Ms. Kunstler, but I believe the law is otherwise. The appellate division didn't even consider my client's post-fleet protestations. Their decision ignored the due process arguments entirely. We're in a situation where the appellate division did not consider these arguments, where Judge Horman and your prior decisions in general Supreme Court standards indicate that these are real arguments. In terms of the cases that my opponent cited, Pignataro, Judge Horman looked at those cases. First of all, Pignataro is not finding precedent on this court. It's an unpublished decision. It's one of your decisions. But in that case, the PRS issue arose in relation to resentencing, and the amended sentence contained no PRS. Now, this court suggested, since there was no PRS, that it couldn't be a direct consequence of the defendant's guilty plea. But as Judge Horman pointed out in his decision, the Pignataro's court that PRS is not a direct consequence because it could be modified is faulty, because even a carceral term can be modified on resentence. I mean, you know, the issue is not whether or not it can be modified later. But, your honors, I would like to close just to highlight the extreme prejudice here that I believe my client has suffered. My client immediately realized that he had made the wrong decision. He immediately tried to correct that decision. He was given very little advice, six seconds of a recitation of what would encumber him for 15 years after his release, and a muddled one hour in the pens with his lawyer to understand something that he was then rushed into at his plea, and has spent the past 11 years regretting and trying to get back. And it is of great significance to him. The carceral term, the term of actual incarceration in prison, has passed. Yet my client is still fighting this, because the onerous term that he still faces matters to him. It mattered to him within five seconds of leaving that courtroom, and it matters to him now. And the court failed him, and his attorney failed him. And those failures amount to a due process violation and ineffective assistance of counsel. And I ask your honors, on that basis, to find in my client's favor. Thank you, counsel. Thank you both. Nice argument. We'll reserve decision.